ON MOTION FOR REHEARING

POLEN, J.
We deny appellees’ Motion for Rehearing, but substitute the following for our slip opinion dated February 7, 2001:
Drs. Jerome Spunberg and Bruce Phillips (“the PA”) were awarded $8,894,542 in compensatory and punitive damages against the University of Miami (“UM”) and $13,938,659 against Columbia/JFK Medical Center, Inc. (“JFK”). Both UM and JFK separately appealed these respective awards, and both jointly appealed from a post-trial order awarding $55,500.85 in costs and $32,577.65 in expert fees to the PA. On our own motion, we consolidate all three appeals for purposes of this opinion, reverse all the awards, and remand the case for a new trial.

Background

Drs. Spunberg and Phillips formed a professional association to provide radiation therapy to cancer patients. In 1985, they entered into a contract with Columbia/JFK Medical Center, Inc. (“JFK”) to be the exclusive provider of such services at the hospital’s new cancer treatment center. The contract had an express termination date of May 30, 1990, but provided that the parties could terminate it on April 30, 1987 or April 30, 1989 upon 90 days’ written notice. It further provided that if the agreement was not renewed or was terminated, all physicians would lose their staff privileges.
In 1987, JFK and the PA canceled their contract. JFK then entered into a new exclusive arrangement with Salick Healthcare, Inc. (“Salick”). Under that arrangement, three new contracts were formed: 1) JFK and Salick entered into a contract (“JFK/Salick contract”) by which Salick agreed to be the sole provider of all radiation therapy services for JFK’s cancer center. The agreement was to terminate “five years from the effective date” of the agreement. As a condition precedent to the agreement, Salick had to enter into a contract with thp PA by which the PA would be the exclusive provider of such radiation therapy services under the JFK/Salick contract. The agreement provided that JFK would have to approve any contracts entered into between Salick and the PA; 2) Salick and the PA entered into an agreement (“Salick/PA contract”) as just explained, and this agreement was to terminate on the April 30, 1992 or when the JFK/Salick agreement terminated. The agreement provided that if this contract was not renewed, the doctors’ staff privileges would automatically terminate at the end date of the contract; 3) JFK and the PA entered into an agreement (“second JFK/PA agreement”) to take the place of their original contract. Under this no-vation, JFK agreed to assume the “benefits and burdens” of the Salick/PA contract should Salick terminate the Salick/PA contract during the term of the Salick/PA contract.
In December, 1991, JFK renewed the JFK/Salick contract through September 30, 1997. However, on October 6, 1996, JFK notified Salick that it would not be renewing its contract after September, 1997.
During the spring of 1997, JFK and UM began negotiations for UM to replace Sal-ick as the exclusive provider of radiation therapy services at JFK’s cancer center. *544 They reached a tentative but substantial agreement to that effect in mid-July. Around this same time, JFK told UM that it anticipated that the PA would continue to provide services at the hospital until the end of its term. JFK indicated that it would not renew its privileges thereafter.
Apparently learning of these negotiations, on June 4, 1997, the PA, through its attorney, notified JFK in writing that its staff privileges could not be affected even if JFK decided not to renew its contract with Salick. It insisted that its “relationship [with JFK] continued as before.”
In September, 1997, the PA contacted UM directors and administrators advising them that its privileges with JFK remained intact. It told UM that it was aware of the university’s negotiations with JFK. UM’s attorney then reviewed JFK’s medical staff bylaws and received assurances from JFK’s representatives that JFK had the right not to renew the PA’s staff privileges. Based on her review and these assurances, UM’s attorney advised the university to proceed with negotiations and consummation of the agreement with JFK.
That same month, JFK purchased a new cancer facility that Salick had finished building. A hospital administrator suggested that the purchase was made so that JFK would not have to compete for the PA’s radiation oncology patients.
On September 24, 1997, the PA read an article in the newspaper stating that once JFK’s contract with Salick ended, and UM’s contract with JFK effectuated, neither Dr. Spunberg nor Dr. Phillips would be practicing at the hospital. The article stated that while the doctors were not employed by either JFK or Salick, they had practicing privileges at the hospital.
On September 26, 1997, JFK notified the PA in writing that it would not be renewing its privileges because it [JFK] was entering into a new exclusive contract with UM. JFK informed the PA that it must cease practicing in the hospital by the end of the year.
On October 6, 1997, the PA sued both JFK and UM. It alleged JFK breached its medical staff bylaws and also that it tor-tiously interfered with the PA’s business relationships. It also asserted a tortious interference action against UM with respect to the PA’s contract with the hospital. It sought both compensatory damages and injunctive relief. It was later allowed to amend its complaint to seek punitive damages against both defendants.
On November 19, 1997, JFK and UM entered into an agreement, effective retroactive to October 1, 1997, whereby UM replaced Salick as the exclusive provider of radiation therapy services at the cancer center. The agreement included an express exception to UM’s exclusivity in the event of a mutual agreement of the parties or court order. The parties agreed that UM could back out of the deal if the PA’s staff privileges were not terminated by the end of the year.
In December, 1997, the PA obtained a temporary injunction allowing it to remain practicing at the hospital until the lawsuit was resolved. In contesting the motion, the hospital admitted that it did not comply with either section 395.0191(4), Florida Statutes (1997)[1], or its bylaws in terminat *545 ing the PA’s staff privileges, but somehow maintained that it'did not need to do so. The trial court rejected that position, and this court affirmed without opinion. Columbia/JFK Med. Ctr., Inc. v. Spunberg, 719 So.2d 298 (Fla. 4th DCA 1998).
On December 22, 1998, after we issued our mandate, JFK notified the PA in writing that it [JFK] was offering the PA a chance to apply for renewal of its staff privileges. On the PA’s pretrial motion in limine, this letter and any testimony regarding the contents of the letter were excluded at trial for all purposes.
Trial began in March, 1999, and lasted four weeks. At trial, Dr. Spunberg testified that the majority of the PA’s patients were referred by other physicians. He testified he told all key JFK administrators that the Salick/PA contract expired in 1992, but that he and Dr. Phillips were still allowed to continue working in the hospital thereafter. In fact, the evidence reflected that JFK even sent the PA application forms for reappointment to the medical staff after 1992 and granted reappointment in 1994-1995 and 1996-1997.[2]
The PA maintained that JFK and UM conspired to steal its practice. It introduced evidence suggesting that UM negotiated for the termination of the PA’s staff privileges. It maintained that both JFK and UM knew that there were no positions available for radiation oncologists at any other area hospital but “didn’t care one way or another.” It acknowledged that most of its patients were elderly and too sick to drive outside the JFK vicinity.
In support of this “conspiracy theory,” the PA introduced a document showing that 80% of the PA’s 2,000 patients lived within a four-mile radius of JFK. The PA argued that this document showed that those patients would remain at JFK even if the PA’s staff privileges were terminated. Furthermore, it introduced a profit analysis prepared by JFK which projected revenues for the cancer center if the PA was eliminated as competition. Finally, it introduced a third document in which JFK recommended purchasing a new cancer center Salick was budding within a few blocks of JFK scheduled to open in 1998. Both JFK and UM admitted that the purchase was to take control over the PA’s patients.
The PA also showed that JFK’s administrators ignored Dr. Spunberg when he tried to discuss how the cancer center would be operated after Salick left. It maintained that it repeatedly advised these administrators that it considered its staff privileges intact at all times. It expressed surprise about learning of its termination in a newspaper article in September, 1997.
JFK admitted it never considered the quality of care given by the PA when JFK terminated its doctors’ staff privileges. It also admitted it did not follow its own bylaws regarding reappointments and *546 hearings.[3] However, it claimed that it terminated the PA’s staff privileges because it believed that the PA intended to compete with JFK at the new cancer treatment facility Salick was building. It showed that as early as 1997 Dr. Spunberg started handing out business cards and placing a yellow pages ad indicating he would also be practicing at Salick’s facility. In any event, both JFK and UM claimed that paragraph 3.7.3 of the bylaws authorized the termination of the PA’s staff privileges.[4]
Notwithstanding the provisions of this bylaw, the PA countered that JFK and UM entered into their agreement before JFK knew Salick was building a new facility. It showed that even after the temporary injunction issued, JFK issued press releases and an annual report stating that the PA would no longer be at the hospital and that UM was the only provider of radiation therapy services there. The report was disseminated to the public.[5] It also maintained that it lost many of its patient referrals and income as a result of the defendants’ actions. It presented testimony of physicians who stopped referring patients to the PA because of their concern over whether they could provide continuity of care should JFK terminate its privileges. Overall, it maintained both parties generally tried to thwart its ability to practice at the center.
With respect to damages, the PA’s expert testified that it would take as long as 10 years for the PA to recover from the loss of referrals at a present value loss of income of anywhere between $2+ million and $3+ million. He admitted during cross-examination that he changed his original figures (provided during discovery) based on a revised report. The defendants’ objections to the new figures were overruled.
The jury awarded the PA $1,933,659 against JFK for both breach of contract and tortious interference with business relationships, and $644,542 against UM for tortious interference with the PA’s contract with JFK. It also awarded the PA $12,000,000 in punitive damages against JFK and $8,250,000 against UM. The court at first limited the punitive damages to three times the amount of the compensatory damages awarded, but on the PA’s motion reinstated the jury’s verdict. Of key import, the court expressly found,
The clear and convincing evidence shows a scheme between the Hospital and the University to expel the Doctors from the Hospital and take over their medical practice.... Decisions in this case were driven by business and profit motives ....
% :jc íH
*547 Both the Hospital and the University were aware that the Hospital’s Bylaws did not allow the Hospital to terminate the Doctors’ medical staff privileges, even if it gave an exclusive contract to the University. The Hospital simply chose to disregard the Doctors’ Bylaw rights. And, the University intentionally and unjustifiably induced or caused the Hospital to wrongfully terminate the Doctors’ staff privileges.... The Defendants’ motives were “business decisions” and profit, pure and simple....
The Court then granted the PA permanent injunctive relief.

Merits

Both UM and JFK argue that the trial court erred in not allowing them to impeach Dr. Spunberg’s testimony with JFK’s letter that effectively allowed the PA to reapply for staff privileges. They argue the exclusion prejudiced them at trial because they were unable to refute the PA’s repeated arguments and testimony that JFK was trying to kick them out and never offered either doctor an opportunity to stay. Concluding that this evidence would have shed light on the issue of good faith, they maintain the jury was not given a complete picture of what really happened.
We believe the court abused its discretion in excluding the evidence. The letter directly refuted Dr. Spunberg’s testimony that he was never offered an opportunity to apply for a position to continue to practice radiation oncology at JFK with UM. The testimony was also prejudicial because it supported the PA’s “conspiracy” theory and weighed on the defendants’ alleged bad faith in not honoring the bylaws.
The PA suggests that any error was harmless because the letter did not state that JFK would allow the PA to continue to practice in the hospital.[6] The letter, however, directly contradicted Dr. Spun-berg’s testimony and, to this extent, it bore on the jury’s perception of the defendants’ [lack of] good faith. Even though it was only one piece of evidence in a month-long trial, without it coming in, the jury had a slanted view of the defendants’ motivations. As the error was not harmless, we hold the defendants are entitled to a new trial.
Because we have reversed both verdicts for a new trial on the merits, the cost award must be reversed as well. While we do not need to reach the other issues raised by the parties in their respective appeals, we do note that, at least based on the evidence presented at the first trial, the court should not have granted a directed verdict on JFK’s estoppel defense. JFK tried its case on the theory that the PA was estopped to deny that it [the PA] had an implied contract with Salick after April, 1992.[7] It maintained that unless the PA had some implied contract with Salick after 1992, it could not have successfully maintained that it had staff privileges at JFK. Assuming the evidence is the same on retrial, this issue should be sent to the *548 jury.[8]
REVERSED and REMANDED for a new trial.
GUNTHER, J., and DONNER, AMY STEELE, Associate Judge, concur.

. This section provides,
(4) Nothing herein shall restrict in any way the authority of the medical staff of a licensed facility to review for approval or disapproval all applications for appointment and reappointment to all categories of staff and to make recommendations on each applicant to the governing board, including the delineation of privileges to be granted in each case. In making such rec *545 ommendations and in the delineation of privileges, each applicant shall be considered individually pursuant to criteria for a doctor licensed under chapter 458, chapter 459, chapter 461, or chapter 466, or for an advanced registered nurse practitioner licensed and certified under chapter 464, or for a psychologist licensed under chapter 490, as applicable. The applicant's eligibility for staff membership or clinical privileges shall be determined by the applicant’s background, experience, health, training, and demonstrated competency; the applicant's adherence to applicable professional ethics; the applicant's reputation; and the applicant's ability to work with others and by such other elements as determined by the governing board, consistent with this part.
§ 395.0191(4), Fla. Stat. (1997).

. It was shown that medical staff privileges are renewed every 2 years.

. Specifically, JFK's bylaws provide that applicants for reappointment show that they remain qualified for staff membership. Section 3.2.1(e) of the bylaws requires that applicants request privileges in an area that is not governed by an exclusive provider contract. An application for reappointment that does not show on its face that the applicant is qualified for staff membership is subject to summary denial without a hearing. However, the denial of an application for an)' other reason requires a hearing at the applicant’s request. It was undisputed that JFK did not provide such a hearing. It was also undisputed that JFK did not make the determinations set forth in section 395.0191(4), Florida Statutes (1997), or section 59A-3.217(e) of the Florida Administrative Code before deciding not to reappoint the PA.

. Paragraph 3.7.3 provides for the automatic revocation of staff membership and hospital privileges to a physician that is under contract with an exclusive provider when the exclusive provider contract is terminated.

. By court order, JFK amended the report to reflect that the PA continued to perform such services at the cancer center.

. Arguing that JFK's letter was nothing more than a settlement offer and, therefore, inadmissible, counsel for the appellees at oral argument stated to this court that this letter was sent on the eve of trial. The record directly refutes this representation.

. Although JFK never pled this specific affirmative defense, the PA argued in support of its motion for directed verdict at trial that "their claim ... of equitable estoppel, as I understand it, is that Dr. Phillips and Dr. Spunberg are estopped to deny that they had a continuing exclusive contract with Salick after 1992. Of course we claim there was no such contract.” It is, therefore, obvious that the PA knew exactly what JFK intended to plead.

. It turned out that the court's error was harmless because, over the PA's objection, it instructed the jury,
The defendants contended that the [Sal-ick/PA] contract extended beyond April 30, 1992 due to the actions of the plaintiffs and Salick. When parties continue operating under a contract after its expiration, a presumption arises that the contract is renewed on its original terms. This is an issue for you to decide.
Thus, the court allowed the jury to determine whether the PA had an implied contract with Salick after their original contract expired in 1992.